IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
-------------------------------------------------------

EDITH DEUTSCH, Personal Representative
of the Estate of Robert Thoreson

                Plaintiff,                      OPINION AND ORDER

    v.                                                    17-cv-259-wmc

CHRISTOPHER BENTON,
SCOTT MORLAND,[1] NICHOLAS SUMINSKI,
and GERALD KATCHKA,

                Defendants.
-------------------------------------------------------

Plaintiff Robert C. Thoreson originally filed this § 1983 suit for what he claims was defendants' unlawful search of his home in the early hours of October 17, 2015, in violation of the Fourth and Fourteenth Amendments. Following Thoreson's death on November 9, 2017, his mother, Edith M. Deutsch, took over this lawsuit as the personal representative of his estate. For convenience, "plaintiff" will refer to Robert Thoreson himself in this opinion, although legally it is now his estate. Before the court are plaintiff's motion for partial summary judgment and defendants' motion for summary judgment. (Dkt. ##36, 39.) Because there are numerous disputes of material fact, both motions will be denied.

---

[1] There appears to be a dispute over how to spell this defendant's last name: Moreland or Morland. The court defers to defense counsel's spelling throughout, rather than that found on ECF. A similar change should be made to the case caption as well. Likewise, there seems to be a disagreement about how to spell the personal representative's name -- Deutsch or Deutch. (*Compare* dkt. #56 ¶ 2 *with* dkt. #37 at 1.) The parties seem to agree that "Deutsch" is appropriate, so the court will defer to that spelling.

# UNDISPUTED FACTS[2]

### A. Background

Shortly after 2:00 a.m. on Saturday, October 17, 2015, Daniel Thoreson's property at 73810 Ondossagon Road, Washburn, Wisconsin was searched as part of a criminal investigation by: defendant Benton, then a sergeant with the Police Department for the Red Cliff Band of the Lake Superior Chippewa Indians, located near the northern-most tip of the State of Wisconsin; defendant Suminski, then a police officer for the City of Washburn, Wisconsin, just 15 miles south of the Red Cliff Reservation; defendant Morland, then a detective with the Police Department of the City of Ashland, Wisconsin, 5 miles further south; and defendant Katchka, then an agent with the Wisconsin Department of Justice, Division of Criminal Investigation ("DCI"). All defendants reside in Wisconsin, and the parties agree that they were acting within the scope of their employment and under the color of law.

At the time, Daniel Thoreson, a brother of the plaintiff,[3] was being investigated for dealing methamphetamine. Specifically, Daniel was under investigation for being a major

---

[2] The following facts are material and undisputed for purposes of summary judgment, except where noted. At the outset, the court notes that responses to proposed findings of fact exist to confirm areas of *factual* agreement and to highlight *factual* disputes. (*See* Pretrial Procedures (located at dkt. #27) 5.) Unfortunately, defendants often treated it as another platform on which to advocate their legal arguments. (*See e.g.*, Defs.' Resp. to Pl.'s PFOF (dkt. #49) ¶ 42.) For example, defendants often answered: "No dispute as to stated factual proposition. Dispute materiality of proposed fact because the entry into Robert's residence was a lawful protective sweep under the Fourth Amendment, the validity of which is not dependent on the officer's knowledge of property boundaries or scope of original warrant. (See Dkt. 40.)" This is not just a pointless exercise. It is a waste of the other party's and the court's time. Any repetition may be subject to sanctions.

[3] Given the common last name "Thoreson" of several of the related individuals involved in the events giving rise to this lawsuit, the court may refer to those individuals by their first names for ease of reference.

distributor of methamphetamine between Minnesota and Ashland, Bayfield, Burnette and Sawyer Counties, an area covering hundreds of square miles and much of Northwestern Wisconsin. In the course of DOJ Agent Katchka's investigation, he learned that Daniel regularly received methamphetamine from Matthew Youngbouer from Hinkley, Minnesota, which Daniel then distributed.[4] Based on his investigation, Katchka applied for a search warrant for Daniel's property, which was granted by Ashland County Circuit Judge Robert E. Eaton. The search warrant authorized the search of Daniel Thoreson's residence at 73810, as well as "any associated storage facilities, outbuildings and vehicles on the premises." (Search Warrant (dkt. #34-4) 1-2.)

Shortly after the search began, defendants Benton, Morland and Suminski crossed the property line separating Daniel's property at 73810 Ondossagon Road from Robert's property at 73780 Ondossagon Road. These properties had separate driveways and different fire numbers, but there was no fence separating them. Once on the 73780 property, Benton, Morland and Suminski opened the south door of Robert's residence into the structure's single room, giving rise to plaintiff's claims.

## B. Pre-Search Meeting

In the evening of Friday, October 16, 2015, defendant Katchka held a meeting with those who were going to participate in the search of Daniel's property. The meeting was in Ashland, at a Wisconsin Department of Natural Resources facility. Over twenty officers

---

[4] Youngbouer apparently considered Daniel to be his "best seller" and sent him methamphetamine at least twice a week. Youngbouer was known for relying on a gang-member bodyguard for protection.

were in attendance; they were from the Ashland Police Department, the Police Department of the Red Cliff Band of Lake Superior Chippewa, the Bayfield County Sheriff's Department, the Wisconsin State Patrol, the Douglas County Sheriff's Department, and DCI. Defendants Benton, Morland and Suminski were among those in attendance.

Defendant Katchka, as the Department of Justice agent previously trained on constitutional principles regarding search warrants, was in charge of the search. He also ran the meeting, passing out copies of an operational plan and informing attendees that Robert lived immediately south of Daniel, while showing aerial photographs of Daniel's residence.[5] Robert's house was also in a photograph, but the boundary between the properties was not marked.

During the meeting, Agent Katchka also used a PowerPoint presentation and whiteboard, although the defendants' memories differ about whether Katchka noted the location of the boundary.[6] Assignments for the execution of the search warrant were handed out during this meeting. Officer Suminski was assigned perimeter duty at the northwest corner of Daniel's house, while Sergeant Benton and Detective Morland were similarly assigned perimeter duty at the southeast corner.

Before this meeting, Agent Katchka had viewed Daniel's residence from the road. In fact, he had driven on Ondossagon Road past Daniel and Robert's homes approximately

---

[5] The parties dispute whether there was one photograph or multiple, however this dispute is not particularly material to defendants' pending motion for summary judgment.

[6] Unfortunately, these demonstratives were apparently destroyed after the meeting, which given the issues that emerged only hours later during the search itself is for the defendants problematic at best.

4

thirty times. Each house has a roadside sign displaying its number. Katchka was aware of this. In fact, he had attempted to find the property line between the properties during his drive-bys. During the meeting, Katchka informed the law enforcement officers that there were campers or sheds between the two houses and that these structures were on Robert's property. Katchka also informed them that Robert's home looked like a garage. According to Katchka, had the other defendants in attendance at the meeting been listening to him, they would have known that the "garage" south of David's house was Robert's home.

While Agent Katchka believed he was as clear as necessary concerning the locations of the property line and Robert's home, the other defendants all disagree: Officer Suminski testified that "[t]o [his] knowledge," no one "ha[d] told [him] where the property line [was]" (Suminski Dep. (dkt. #31) 22:21-23); Detective Morland did not "remember talking about property lines" (Morland Dep. (dkt. #33) 7:19-24); and Sergeant Benton left the meeting understanding that Robert lived to the south and believing that he lived on a large farm, also viewable in the aerial photo (Benton Dep. (dkt. #32) 8:13-9:2).

C. Execution of the Warrant

Before beginning the search, the participating officers assembled at the Washburn Elementary School. At that point, Katchka confirmed they would be executing the search warrant.[7] The officers put on their gear before driving to Ondossagon Road. Sergeant Benton parked in Daniel's driveway before going to his assigned position, taking an AR-15 rifle and his sidearm with him. Upon arrival, Officer Suminski parked and ran up the

---

[7] The parties agree that a second property in the Village of Washburn was also searched pursuant to a separate warrant on October 17, 2015.

5

driveway towards his assigned position. Passing around the first building on the property, Suminski and Washburn Police Chief Ken Johnson encountered a woman, Tabatha Zwetow, Daniel's girlfriend, and took her into custody. Zwetow had apparently been running on the property wearing a "Friday the 13th" hockey mask. Several other people ran away from Daniel's residence towards outbuildings. Two other people were also taken into custody at this point, including Daniel's suspected meth supplier, Youngbouer. By that time, DCI agents and the Bayfield Emergency Response Team had also apparently entered and cleared Daniel's residence.

After being at his assigned perimeter post for only a few minutes, Officer Suminski encountered Sergeant Benton and Detective Morland. At that point, all three defendants claim that someone then instructed them to clear the campers, boats and buildings of people. Although none of the three defendants were able to recall who gave that instruction, they agree that person did not detail where the property line was. Defendants characterize their subsequent movements as a "protective sweep . . . for officer safety." (*See* Defs.' Resp. to Pl.'s PFOF (dkt. #49) ¶ 66.) The parties agree that this action was to locate people, not contraband.

As defendants Suminski, Benton and Morland began to clear the buildings, boats and campers, Suminski had still not seen the search warrant; Morland did not know where the property line was; and Benton thought that the property line was farther to the south. As the three moved south, they encountered some campers, which Benton and Morland entered. These campers were no longer on Daniel's property, but rather on Robert's. Benton, Morland and Suminski then continued southward, where they encountered

Robert's home.

The parties dispute whether Robert's home was "a garage structure" or "an L-shaped building."  (*See* Defs.' Reply to Pl.'s Resp. to Defs.' PFOF (dkt. #56) ¶ 18.)  The parties do agree that Robert's home is comprised of a two-vehicle garage with an attached dwelling.  This is a picture of the exterior of Robert's home:



(Exterior Photo (dkt. #50-4) 1.)   As reflected in the picture, a garage door was open when Benton, Morland and Suminski approached.  A grey Subaru Impreza was parked in front of the garage, which at the time they recall thinking belonged to Tabatha Zwetow, the woman taken into custody earlier.  It actually belonged to Robert.

Once arriving at the home's curtilage, defendants Benton, Morland and Suminski continued to walk around the structure.  They could see into the home through a window on the west side.  They saw a television set was on, as well as several drones.  Officer Suminski thought that the television could indicate that someone was inside.  They also located a door on the south wall, which was unlocked.  All three defendants report having a discussion before going inside, with Sergeant Benton and Suminski having rifles at the ready.

When the three defendants entered Robert's home, Robert was asleep with his C-

Pap mask on his face. He was woken by someone shouting "This is the police. We got a search warrant." Pointing his rifle at Robert, Officer Suminski also directed him to show his hands. Although Suminski denies saying more, plaintiff contends that one of the officers yelled, "Don't move you cock sucker. I'll blow your fucking head off, don't move, let me see your hands, don't move. We got a fucking search warrant." Either way, the officers pulled the blanket off Robert and the bed. Robert was only wearing his underwear and C-Pap machine mask.

The parties dispute whether Robert was pushed back onto his bed the first time he tried to stand. Whenever he was allowed to stand, all agree he turned on the light on his ceiling fan. Robert then sat at his desk. He looked around and saw three law enforcement officers in his bedroom. He then asked, "What the fuck is going on here? What is this, Russia?" One of the officers again told him they had a search warrant. He replied "There's nothing here." When asked to identify himself, Robert identified himself as "Bob Thoreson." Robert was upset about the officers' presence, and they tried to calm him. When asked about his relationship with Daniel, he told the officers that they were brothers. Suminski then realized the officers may have crossed the property line between the brothers' properties. Before leaving the home, one of the officers allegedly said, "Oh shit."

Defendants contend that they were in Robert's home for approximately two minutes. At some point while in Robert's residence, an officer looked in a large freezer chest. They did not seize any property from Robert's home. Agent Katchka did not know that Benton, Morland and Suminski entered Robert's residence until after the search was concluded. Sergeant Benton now believes that he should have been informed about the

8

location of the property line.

OPINION

Summary judgment is appropriate if the moving party shows that (1) "there is no genuine dispute as to any material fact" and (2) it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's role at summary judgment is not to "weigh evidence, make credibility determinations, or decide which inferences to draw from the facts"; rather, its role is "to determine whether there is a genuine issue of triable fact." *Kirkwood v. DeLong*, 683 F. Supp. 2d 823, 826 (N.D. Ind. 2010) (citations omitted).

Plaintiff brings his claim under § 1983. "To state a claim for relief under 42 U.S.C. § 1983, the [plaintiff] must allege: (1) [he was] deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was vested upon [him] by a person or persons acting under color of state law." *Jones v. Wilhelm*, 425 F.3d 455, 465 (7th Cir. 2005) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)). While the parties agree that the defendants were acting under the color of law, summary judgment is inappropriate here because there are too many material facts in dispute as to the first requirement for any party to prevail on a claim or defense as a matter of law.

The warrantless search of plaintiff's home presumptively "violate[s] the Fourth Amendment's prohibition against unreasonable searches and seizures unless [it] fall[s] into one of the numerous exceptions." *United States v. Starnes*, 741 F.3d 804, 807 (7th Cir.

9

2013) (citing *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011)).[8] This is because "[t]he sanctity of the home is a central concern of the Fourth Amendment." *United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). Moreover, "the home is sacred in Fourth Amendment terms not primarily because of the occupants' *possessory* interests in the premises, but because of their *privacy* interests in the activities that take place within." *Id.* at 734 (alteration added) (quoting *Segura v. United States*, 468 U.S. 796, 798 (1984)) (internal quotation marks omitted). Indeed, the Seventh Circuit has observed that "people have a strong interest . . . in keeping unwanted strangers, including law enforcement officers, out of their home, and the interest is deemed a reasonable one in our society." *United States v. Simms*, 626 F.3d 966, 970 (7th Cir. 2010). People also "have a similar interest in excluding strangers from the property that immediately surrounds their house" -- the curtilage. *Id.*

Accordingly, in executing a search warrant, law enforcement officers must take due care to protect the privacy interests of property owners by ascertaining that they are searching the correct property. *See Jones v.*, 425 F.3d at 465 (declining to find search of incorrect apartment a valid warrant execution because a reasonable officer would have recognized the warrant's fatal ambiguity either before or after arriving at the apartment building). The strength of this right, the presumption it creates with respect to a

---

[8] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. Amend. IV. The Fourth Amendment is incorporated against the states by the Fourteenth Amendment. *See Zoretic v. Darge*, 832 F.3d 639, 643 (7th Cir. 2016) ("The Fourth Amendment's protections against unreasonable searches and seizures is made applicable to state actors under the Fourteenth Amendment." (citing *DKCLM v. Cnty. of Milwaukee*, 794 F.3d 713, 714 (7th Cir. 2015))).

warrantless home invasion, and the troubling record in this case, all raise legitimate factual questions as to whether defendants took due care in both preparing to execute and actually executing the subject warrant, as well as whether they were acting in good faith in doing either.

The first material dispute concerns whether Agent Katchka and the other defendants took reasonable care *in advance* of the warrant's execution to avoid an unlawful search of plaintiff's home. The defendants do not even agree among themselves about whether Katchka adequately informed the others about the location of the property line. Katchka believes he did, while the other three defendants either do not recall being told about the property line or left the pre-search meeting with a mistaken understanding of the line's location. This alone precludes summary judgment.

All of the defendants had an obligation to know the limits of the search warrant before executing it. *See Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (explaining that the Fourth Amendment's "'central requirement' is one of reasonableness" (quoting *Texas v. Brown*, 460 U.S. 730, 739 (1983))). Given the defendants' own factual disagreements, a jury will have to decide whether defendant Katchka failed to educate the other defendants properly, whether the other defendants failed to listen to Katchka's instructions, or whether the invasion of plaintiff's home in presumptive violation of his Fourth Amendment rights occurred despite the defendants' reasonable planning efforts.

The next material dispute concerns whether defendants Morland, Suminski and Benton exercised due care undertaking a protective sweep in the course of executing the warrant. "A protective sweep is a quick and limited search of premises conducted to protect

11

the safety of police officers or others" and "is permissible because legitimate governmental interests outweigh an individual's interest in the protection of the Fourth Amendment." *Starnes*, 741 F.3d at 807-08 (citing *Maryland v. Buie*, 494 U.S. 325, 327, 331 (1990)). A protective sweep is still a "search," albeit one that is "permissible on less than probable cause only because they are limited to that which is necessary to protect the safety of officers and others." *Buie*, 494 U.S. at 335 n.3. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is 'infringed.'" *Kirkwood*, 683 F. Supp. 2d at 830 (citing *United States v. Brock*, 417 F.3d 692, 696 (7th Cir. 2005)). The sweep itself must last "no longer than is necessary to dispel the reasonable suspicion of danger," and it must be cursory in nature, limited to "visual inspection of places where a person might be hiding." *Starnes*, 741 F.3d at 808 (citing *Buie*, 494 U.S. at 335-36).

Similarly, the requisite "reasonable suspicion of danger" must be "based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id.* (quoting *Buie*, 494 U.S. at 327). "[M]ere inchoate and unparticularized suspicion or hunch[es]" are insufficient. *Id.* (quoting *Buie*, 494 U.S. at 332). It is defendants' burden to establish that the protective sweep was warranted and that it did not exceed its legal scope. *Kirkwood*, 683 F. Supp. 2d at 831. That said, the court has yet to find a single case upholding a protective sweep that crossed

property lines, let alone entering into a neighbor's home.[9]

Here, factual disputes abound as to whether defendants Morland, Suminski and Benton were even conducting a reasonable protective sweep and whether they should have (or did) know that they were crossing onto Robert's property and ultimately barging into his home in the early hours of October 17, 2015. As to the home invasion itself, defendants repeatedly characterize the building as a "garage," while plaintiff contends that the structure was obviously a house. Even in the dark and under pressure to complete the sweep, only a jury can decide whether in the dark defendants Morland, Suminski and Benton reasonably believed that Robert's home was a garage or someone's home, particularly when there is evidence they were told in advance that Robert's home looked like a garage.

Finally, the court must address defendants' assertion of the doctrine of qualified immunity, which protects government officials from lawsuits stemming from their performance of discretionary functions, so long as "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Jones*, 425 F.3d at 460 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). In determining whether qualified immunity applies,

> First, a court must decide whether the facts, when viewed in the light most favorable to the plaintiff, indicate that the officer's conduct violated some constitutional right of the plaintiff. Second, if the answer to the first question is "yes," then the court must determine whether the constitutional right

---

[9] The court has, however, found a case affirming suppression of evidence where police searched a second residence as an "outbuilding" of the property identified in the warrant because no reasonable officer would have considered the second residence a "garage," even though both were on the *same* parcel. *See People v. Nguyen*, 219 Cal. Rptr. 3d 124 (Ct. App. 2017).

> was "clearly established" at the time of the alleged violation. The officer will enjoy qualified immunity unless the court affirmatively answers *both* questions.

*Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

A right is "clearly established" when a reasonable officer would know that his "conduct was unlawful in the situation he confronted." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 915 (7th Cir. 2011) (quoting *Saucier*, 533 U.S. at 202). The court "may properly take into account any information the defendant ought reasonably to have obtained" in determining if his actions violated a clearly established right. *Id.* at 461.

Here, the factual disputes that preclude summary judgment on liability also preclude summary judgment on defendants' qualified immunity defense. Whether defendants Morland, Suminski and Benton had the right to cross the property line separating Daniel's property from Robert's in order to conduct a protective sweep is dependent on the reasonableness of: (1) the officers' preparation before the execution of the warrant; (2) the failure to recognize the property line in the dark; and (3) the continuation of the protective sweep *into* plaintiff's home. These determinations are themselves interrelated: Did the officers have reason to clear the outbuildings on Daniel's property under the circumstances? If the officers were adequately informed about the property line, but they got confused, should they have known that plaintiff's home was a house and not a garage? Would a reasonable officer have made that realization while prowling around the structure and peering in?

In reaching the ultimate question of good faith immunity, the court is in no way dismissing the difficult position in which defendants were placed. In fact, the parties agree

that there were serious safety concerns involved in executing the subject search warrant because Daniel's drug associates were known to be violent. Daniel's associates had been involved in a robbery, shootout, substantial battery, attempted kidnapping, attempted disarming of an officer, and vehicular theft. Daniel had also previously assaulted at least one person at his home in connection with meth. Additionally, Daniel's son, Daniel Thoreson, Jr., used to live with his dad, and was known to be involved in meth distribution. The officers further knew Daniel Jr. to be unstable, having previously attacked people, and wearing body armor. Daniel Jr. was due to be released from incarceration around the time of the search.[10] The defendants were purportedly aware of these facts, and they believed there was a high probability of encountering dangerous and armed individuals during the execution of the warrant. Indeed, law enforcement officers patrolled the perimeter in the first place because of this concern.

On the fact here. the court is not in a position to conclude that qualified immunity prevents plaintiff from recovering monetary damages arising out of the defendants' presumptively unreasonable invasion of his home, at least when viewed in a light most

---

[10] Daniel Jr.'s Rottweiler was also found on the property; Daniel Jr. was known for keeping this dog with him. Defendants contend that the dog's presence led them to believe Daniel Jr. was nearby. Although not material given the other violent associates potentially on Daniel's property, plaintiff purports to dispute this fact, explaining that:

> These officers did not know whether Daniel Thoreson, Jr., was still incarcerated or not, but if he was incarcerated, his dog would obviously have to be somewhere else, and his father's rural homestead would be one logical place. "Home is the place where, when you have to go there / They have to take you in," apparently even if you're just a Rottwei[ler].

(Pl.'s Resp. to Defs.' PFOF (dkt. #51) ¶ 66.)

favorable to plaintiff. Regardless, the court is not in a position to decide that question without a full airing of the facts at trial. As to defendant Katchka, he may have the best argument for qualified immunity because he did not enter plaintiff's property at all, much less his home. However, the court cannot make that decision without additional facts, including whether he exercised due care in informing the other defendants about the location of Robert's property line and home. That, too, must await trial.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #39) is DENIED.

2) Plaintiff's motion for partial summary judgment (dkt. #36) is DENIED.

Entered this 15th day of August, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge